IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 12, 2020

## STATE OF TENNESSEE v. DAVID CHARLES GAMBRELL

**Appeal from the Criminal Court for Sumner County**
**No. CR-40-2018     Dee David Gay, Judge**

_____

### No. M2019-00773-CCA-R3-CD

_____

David Charles Gambrell, Defendant, was indicted for five counts of statutory rape by an authority figure and two counts of sexual battery by an authority figure based on allegations made by his fifteen-year-old stepdaughter.  Defendant pled guilty to amended charges of four counts of aggravated statutory rape with the trial court to determine the length and manner of service of the sentence.  The remaining counts were nolle prossed.  After a sentencing hearing, the trial court denied Defendant's request for judicial diversion, ordering him to serve four years in incarceration for each conviction, with the sentences to be served consecutively, for a total effective sentence of sixteen years.  Defendant appeals his sentences.  After a review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., J., joined.  NORMA MCGEE OGLE, J., concurred in results only.

Matthew Edwards (on appeal), Hendersonville, Tennessee, and Micah Gagney Ketron (at trial), Gallatin, Tennessee, for the appellant, David Charles Gambrell.

Herbert H. Slatery III, Attorney General and Reporter; Brent Cherry, Senior Assistant Attorney General; Ray Whitley, District Attorney General; and Tara Wyllie, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

*Factual Background*

During the summer of 2017, the Department of Children's Services ("DCS") received a referral with regard to sexual activity that took place between the fifteen-year-old victim and Defendant, the perpetrator.[1] Officers from the Sumner County Sheriff's Office investigated the allegations, in part, by interviewing the victim. During her interview, the victim explained that Defendant was her stepfather and that there had been inappropriate sexual contact between them between Christmas of 2016 and January of 2017. During Defendant's interview, he confessed to some of the sexual contact described by the victim, including but not limited to digital penetration of the victim's vagina, oral penetration of the victim's vagina, and contact between Defendant's hand and the victim's vagina.

As a result of the investigation, Defendant was indicted in January of 2018 by the Sumner County Grand Jury with five counts of statutory rape by an authority figure and two counts of sexual battery by an authority figure. Defendant entered guilty pleas prior to trial to amended charges of four counts of aggravated statutory rape, with the length and manner of service of the sentence to be determined by the trial court after a sentencing hearing.

At the sentencing hearing, the trial court allowed Defendant to withdraw his guilty pleas on two counts of the indictment (Counts Two and Four), allowed Count Two to be amended to state that "sexual penetration was done by digitally penetrating the victim" rather than "by having sexual intercourse with the victim." The trial court then accepted Defendant's to guilty plea to Count One, Count Two as amended, Count Three, and Count Five. The remaining counts were nolle prossed.

*Sentencing Hearing*

At the sentencing hearing, the victim's biological grandmother, C.L., explained that when the victim was born, the victim's biological mother and the victim lived with C.L. and her husband. When the victim's biological parents both terminated their parental rights, C.L. and her husband formally adopted the victim when the victim was about five years of age.

According to C.L, the victim "had gotten into trouble at school on several occasions" for "cutting herself," taking drugs, and trying to commit suicide by taking pills. C.L. claimed that a juvenile court probation officer "saved [the victim's] life" by helping to get her admitted to an inpatient treatment facility. The victim was fifteen at the time and spent around five months at the treatment facility. While the victim was a

---

[1] It is the policy of this Court to protect the identity of victims of sexual abuse.

patient, she disclosed that Defendant had been abusing her sexually when she visited her biological mother.

Rebecca Page, an investigator with DCS, received information from the residential treatment facility that the victim disclosed abuse during "therapy sessions." Detective Scott Bilbrey of the Sumner County Sheriff's Office investigated the allegations. He met with the victim at the treatment facility. At the time, the victim was identifying as a male and asked to be referred to by a male name. The victim explained that she saw herself as a straight male who was attracted to females. The victim told Detective Bilbray that prior to the abuse, she had several conversations with Defendant about her sexual orientation.

The victim "had difficulty going into great detail" during the interview but was able to disclose that the abuse started around Christmas of 2016 and continued until mid-January of 2017. The victim disclosed that the abuse occurred when she visited her biological mother and Defendant. The victim described her mother as a heavy drug user and explained that her mother was usually "out of it." The victim herself admitted to drug and alcohol use during this time period. The victim explained to Detective Bilbrey that around Christmas of 2016 there were two main instances of inappropriate physical contact that occurred at Defendant's house, including, in Detective Bilbrey's words: "oral, her on him, two times; oral, him on her, two times; his hand on her breast, three to four times; penile penetration, two times; and he touched her vagina with his hands, skin to skin contact, approximately six to seven times." Despite the victim's difficulty remembering the specifics of each encounter, she described in detail the time when Defendant inserted his finger into her vagina because she described his finger as rough and uncomfortable. The victim explained that Defendant was a mechanic and that his hands were rough.

The victim was able to give the exact date of one instance of abuse, May 21, 2017. The victim explained to Detective Bilbrey that she rode with defendant from her grandparents' home to a Dollar General Store where Defendant touched the victim's bare breast inside of her shirt. The victim went into treatment the next day.

After the victim left the treatment facility, she agreed to a "controlled phone call" with Defendant. During the call, the victim told Defendant that she now realized that she liked boys because of the things she did with Defendant. While Defendant never came out and said exactly how he abused the victim, he acknowledged that he understood to which incidents the victim was referring.

Detective Bilbrey visited Defendant at his job. Defendant initially denied the allegations but eventually admitted that that there was some sexual contact between him and the victim. Defendant claimed that the victim initiated some of the contact, once

after he had taken two Tylenol PM and a shot of whiskey. Defendant got up to go to the restroom and was confronted by the victim who asked him to show her how a man touches a woman. The victim took his hand and placed it on her body. Defendant insisted that he told the victim he was not comfortable with what the victim was asking and that she needed to go talk to her biological mother.

Defendant talked about a trip to Dollar General during which the victim exposed her vagina and asked Defendant how it looked after she shaved. Defendant claimed that the victim took Defendant's hand and placed it between her legs. Defendant insisted that he pulled his hand away and did not realize that the victim was unclothed because it was dark. However, Defendant later admitted that he touched the victim and that he penetrated her with his finger but claimed that there was no full digital penetration. At first, Defendant adamantly denied that he performed oral sex on the victim. Defendant later admitted that he got "real close" to the victim's vagina with his face but that he did not touch the victim orally. Defendant later admitted that he "lick[ed]" the victim's vagina on at least two occasions. Defendant claimed that he threw up after this incident. Defendant denied penile penetration and did not remember the victim performing oral sex on him and if it happened he was probably asleep. As a result of the interview, Defendant was arrested.

C.L., her husband, and the victim moved to Florida after the victim was released from the treatment facility because they were "afraid." C.L. explained that the impact of Defendant's actions on their family was "[d]evastating" and that the victim had "gender identity issues." The victim's biological mother called her a "liar and told her [the abuse] was her fault."

C.L. described Defendant as a "monster who completely destroyed [the victim's] childhood, her adulthood, and her chance of ever knowing what it is to have a normal relationship, to get married, or to have children."

Defendant called several character witnesses, including his niece. Defendant's niece, who was age twenty at the time of the sentencing hearing, explained that she lived near Defendant on the same piece of property. She trusted Defendant and did not know him to abuse drugs or alcohol. She explained that he was dyslexic and had a difficult time reading and writing. Defendant's niece admitted that Defendant told her about one encounter with the victim "where there was alcohol involved and they were together."

Dan Klitz had known Defendant for about ten years and described him as a "good friend." Mr. Klitz heard Defendant express remorse over the events but never heard Defendant admit that he was in a sexual relationship with the victim. However, Mr. Klitz did not think Defendant was guilty because Defendant had never been in trouble and was

a positive influence during his own depression after his wife died. Despite his positive take on Defendant, Mr. Klitz commented that if he caught someone doing something sexual to either of his own daughters he would "shoot them."

Susan Morrow, a probation and parole officer with the Tennessee Department of Correction, testified that she prepared Defendant's presentence report. She explained that she incorporated Defendant's statement into the report. She conducted a risk/needs assessment or "STRONG-R" evaluation and determined Defendant's overall risk was low but that she did not place any value in this evaluation.

David Thomas Lubin, an officer with the Mid-Cumberland Human Resource Agency, explained that he supervised Defendant on community corrections bond supervision from October 11, 2017, to the time of the sentencing hearing, or approximately eighteen months. Defendant was required to report once a week and submit to random drug screens. Officer Lubin "never had a problem with [Defendant] during his reporting." Defendant failed several drug screens due to the fact that he had a valid "prescription for oxycodone."

Defendant testified at the hearing. At the time, he was forty years old and worked at his father's shop as a mechanic. Defendant explained that he used to work for the Tennessee Department of Transportation but that he was fired after his arrest. Defendant was married and had a three-and-a-half-year-old daughter. He had a large extended family who lived near him, all in separate homes on part of a large piece of property. Defendant was dyslexic and had trouble reading and writing. His wife helped him prepare his statement. Defendant did not have issues complying with his bond conditions. For the first two months after his arrest, Defendant was actually prohibited from being around his own child. Defendant explained that he was able to abide by all the restrictions of his release, including the sex offender registry. Defendant explained that he "messed up" and "did things that [he] shouldn't have done" and "didn't stop them when they should have stopped." Defendant denied initiating any kind of sexual encounter with the victim and apologized for failing the victim. On cross-examination, Defendant insisted that the victim "suggested" everything that happened. "She talked about it and stuff led into other things and she asked about, honestly, inappropriate things that [he] shouldn't have never talked to her about." Defendant described the victim as "curious." Defendant explained,

> there was one time when my hand was placed between her legs and then there was another night that she had come up and that was the night that I had come home from work and I was overly tired and stuff. Honestly, . . . , I'm sorry, because I don't remember exactly all the details because I was so tired and stuff happened that shouldn't have happened.

In all, Defendant admitted that there were four instances of abuse but denied penile penetration. At this point, the parties agreed that Count Two of the indictment should be amended to allege digital penetration rather than penile penetration. As a result, the trial court amended Count Two of the indictment. The trial court also allowed Defendant to withdraw his guilty plea on Count Four (alleging sexual intercourse) and substitute a guilty plea on Count Five (alleging digital penetration).[2]

At the conclusion of the sentencing hearing, the trial court denied judicial diversion and alternative sentencing. The trial court sentenced defendant to four years for each conviction, to be served consecutively, for a total effective sentence of sixteen years. Defendant appealed.

*Analysis*

Defendant complains that the trial court gave "little to no consideration" to alternative sentencing. Specifically, he argues that the trial court ignored the fact that he had no prior criminal history, was the primary caregiver in his family, and that his crimes were nonviolent. Additionally, Defendant argues that the trial court did not give any weight to sentencing principles, improperly sentenced him to the maximum sentence in the range for each offense, and improperly denied judicial diversion. Finally, Defendant challenges the trial court's decision to order consecutive sentencing. The State argues that the trial court did not abuse its discretion.

When a defendant challenges the length or manner of service of a within-range sentence, this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012); *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). This presumption applies to "within-range sentencing decisions that reflect a proper application of the purposes and principles of the Sentencing Act." *Bise*, 380 S.W.3d at 707. A trial court abuses its discretion in sentencing when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997) (citing *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996)). This deferential standard does not permit an appellate court to substitute its judgment for that of the trial court. *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). The defendant bears the

---

[2] The State commented that "because digital, oral, and penile penetration are all the same level of offense for aggravated statutory rape" the State did not oppose the amendment or modification of the guilty plea.

burden of proving that the sentence is improper. T.C.A. § 40-35-101, Sentencing Comm'n Cmts.

## A. Denial of Judicial Diversion

Defendant first argues that the trial court erred in denying judicial diversion. Judicial diversion is a form of probation that affords certain qualified defendants the opportunity to avoid a permanent criminal record. *See* T.C.A. § 40-35-313(a)(1)(A). "Judicial diversion is a form of 'legislative largess' available to qualified defendants who have entered a guilty or nolo contendere plea or have been found guilty of an offense without the entry of a judgment of guilt." *State v. King*, 432 S.W.3d 316, 323 (Tenn. 2014). If a defendant qualifies for judicial diversion, a trial court may defer proceedings without entering a judgment of guilt, placing the defendant on probation without categorizing the defendant as a convicted felon. *Id.* Upon successful completion of the probationary period, the trial court will dismiss the charges, and the defendant may seek expungement of the record, which "restore[s] the person, in the contemplation of the law, to the status the person occupied before such arrest or indictment or information." *King*, 432 S.W.3d at 323 (quoting *State v. Schindler*, 986 S.W.2d 209, 211 (Tenn. 1999)); *see* T.C.A. § 40-35-313(a)(2), (b). However, if the defendant violates the terms of his or her probation, "the court may enter an adjudication of guilt and proceed as otherwise provided." T.C.A. § 40-35-313(a)(2).

A defendant is eligible for judicial diversion if he or she is found guilty or pleads guilty or nolo contendere to a Class C, D, or E felony, has not been previously convicted of a felony or Class A misdemeanor, has not been previously granted judicial or pretrial diversion, and is not seeking deferral for a sexual offense. *See* T.C.A. § 40-35-313(a)(1)(B)(i). Aggravated statutory rape, Defendant's conviction offenses, are not classified as sexual offenses for purposes of judicial diversion. *Id.* "Eligibility under the statute does not, however, constitute entitlement to judicial diversion; instead, the decision of whether to grant or deny judicial diversion is entrusted to the discretion of the trial court." *King*, 432 S.W.3d at 323. The trial court must consider several common law factors:

'(a) The accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, and (f) the deterrence value to the accused as well as others. The trial court should also consider whether judicial diversion will serve the ends of justice—the interests of the public as well as the accused.'

*Id.* at 326 (quoting *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996)); *see State v. Electroplating, Inc.*, 990 S.W.3d 211, 229 (Tenn. Crim. App. 1998). "[T]he trial court must weigh the factors against each other and place an explanation of its ruling on the record." *Id.* (citing *Electroplating, Inc.*, 990 S.W.2d at 229).

When the trial court considers the common law factors, "specifically identifies the relevant factors, and places on the record its reasons for granting or denying judicial diversion," then this Court will "apply a presumption of reasonableness and uphold the grant or denial so long as there is any substantial evidence to support the trial court's decision." *Id.* at 327. Our supreme court has explained:

> Although the trial court is not required to recite all of the *Parker* and *Electroplating* factors when justifying its decision on the record in order to obtain the presumption of reasonableness, the record should reflect that the trial court considered the *Parker* and *Electroplating* factors in rendering its decision and that it identified the specific factors applicable to the case before it. Thereafter, the trial court may proceed to solely address the relevant factors.

*Id.* Failure to consider the common law factors results in a loss of the presumption of reasonableness, and this Court will either conduct a de novo review or remand the case to the trial court for reconsideration. *Id.* A trial court can also abuse its discretion by considering and placing undue weight on an irrelevant factor. *See State v. Chyanne Elizabeth Gobble*, No. E2014-01596-CCA-R3-CD, 2015 WL 12978645, at *6 (Tenn. Crim. App. Aug. 12, 2015), *no perm. app. filed.*

At the sentencing hearing, the State introduced the presentence report, which indicated that Defendant was forty years of age, had graduated from high school, and had a mechanic's certificate from Tennessee Technology Center. Defendant provided a brief family history in preparation of the presentence report, during which he explained that his childhood "wasn't bad" and that he grew up in a two-parent household. Defendant reported that his family, including his parents and two sisters, lived on property adjacent to his own. Defendant was still married to the victim's mother and they had a small child. Defendant reported his own mental health as "fair." He claimed to suffer from depression and anxiety from his legal issues. Defendant also reported that he was dyslexic. At the time of the hearing, Defendant was employed by Ray's Towing and Repair, a company owned by his father. Defendant had no prior convictions.

The presentence report included a victim impact statement in which the victim explained the degree to which the abuse had affected her life. She reported that she started cutting herself with a knife given to her by Defendant, took various pills, drank

cough syrup, and burned herself with pencil erasers to "keep [] from having real feelings and bury what [Defendant] did to [her]." She admitted that she only felt safe enough to tell someone about the abuse after five months in an inpatient facility.

The trial court determined that Defendant was a Range I, standard offender with no prior criminal record. The trial court first considered judicial diversion, making specific findings with regard to each of the *Electoplating* factors. As to Defendant's amenability to correction, the trial court noted that the court did not "think that is a positive factor in this particular situation." When looking at the circumstances of the offense, the trial court noted that "because of the effects of these crimes, the circumstances are about as bad as [the trial court had] seen." The trial court explained the victim had no family to give her stability where Defendant readily admitted that he breached the victim's trust by abusing her repeatedly. The trial court was particularly concerned by the mental health effects on "this little girl." The trial court noted Defendant had no criminal record, indicating this factor weighed in favor of diversion. Likewise, the trial court considered Defendant's social history, or his "ability to know right and wrong," noting that Defendant was diagnosed with a "paraphilic disorder" which is a "type of mental disorder characterized by a preference or obsession with unusual sexual practices." The trial court concluded that the social history "does not weigh in favor of [Defendant]" but that the "status of [Defendant's] physical and mental health" was "neutral." With regard to deterrence, the trial court noted that there was immeasurable "deterrent effect in society to deter step-fathers from abusing their 14- and 15-year-old stepdaughters." Lastly, when considering whether judicial diversion would serve the ends of justice, the interests of the public as well as the accused, the trial court commented that the victim had "absolutely no relief in her environment" at home and that "the interest of the public cannot be served here in this case." The trial court stated that "the interest of the public demands attention to dysfunctional families" and that it was "in the interest of the public to know what [Defendant] has done." The trial court determined that diversion should be denied.

Here, the trial court engaged in a very detailed and thorough examination of the *Electroplating* factors prior to denying diversion primarily on the basis of the circumstances of the offense. Because the trial court properly identified and weighed the *Electroplating* factors, we afford the trial court's decision to deny judicial diversion a presumption of reasonableness and assess whether there was any substantial evidence in the record to support that decision. *King*, 432 S.W.3d at 327; *Parker*, 932 S.W.2d at 958. After our review, we determine that there was substantial evidence in the record to support the denial of diversion. While Defendant was certainly amenable to correction, as evidenced by his employment record and lack of a criminal record, it was within the trial court's discretion to conclude that Defendant's social health history as well as the circumstances of the offense outweighed the other factors that favor the granting of

diversion. There is no denying the emotional nature of the abuse resulting from Defendant's actions and the lasting effects on the victim. Defendant was an entrusted member of her family. While doing so, he used his position of authority to abuse her sexually. As a result of the abuse, the victim suffered unfathomable mental anguish. The trial court did not abuse its discretion in denying judicial diversion. Defendant is not entitled to relief on this issue.

## B. Sentence Length

Prior to fashioning the length of the sentence for each conviction, the trial court noted that it was considering the guidelines set forth in Tennessee Code Annotated section 40-35-103, including the evidence at the sentencing hearing, the presentence report, Defendant's testimony, the nature of the criminal conduct, the evidence with regard to mitigating and enhancement factors, Defendant's potential for rehabilitation, and Defendant's background. The trial court determined that Defendant's employment history and his family support should be applied as mitigating factors. *See* T.C.A. § 40-35-114(13). With regard to enhancement factors, the trial court determined that the victim was particularly vulnerable because of her age. *See* T.C.A. § 40-35-114(4). The trial court blamed Defendant for his contribution to "where the victim is now." The trial court also determined that the personal injuries inflicted on the victim were great because the victim was "going to be looked over as it looks right now possibly the rest of her life." *Id.* § 40-35-114(6). The trial court also found that the offense was involved to gratify Defendant's desire for pleasure or excitement and that Defendant abused a position of private trust, as the victim's stepfather. *Id.* § 40-35-114(7); (14). The trial court acknowledged that Defendant's lack of criminal history was a mitigating factor. The trial court made clear that he was considering the imposition of a sentence justly deserved in relation to the seriousness of the offense, classifying Defendant's actions as "serious," noting that the "only thing more serious is damage, physical damage through violence or homicide." The trial court noted that there was "no excuse" for Defendant's actions. With regard to Defendant's potential or lack of potential for rehabilitation, the trial court took into account Defendant's diagnosis of paraphilia, Defendant's own "illogical version of the events," and Defendant's lack of understanding of his behavior as contributors to his poor prognosis in community-based treatment. As a result, the trial court sentenced Defendant to four years for each conviction. We conclude that the length of the sentence is not excessive.

## C. Alternative Sentencing

A defendant is eligible for alternative sentencing if the sentence actually imposed is ten years or less. *See* T.C.A. § 40-35-303(a). Moreover, a defendant who is an

especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary. *See* T.C.A. § 40-35-102(6). Defendant was convicted of Class D and E felonies and several misdemeanors and was sentenced to an effective sentence of sixteen years. Defendant was eligible for probation based on the length of each of his sentences and the fact that he was a standard offender.

Although the trial court is required to automatically consider probation as a sentencing option, *see* Tennessee Code Annotated section 40-35-303(b), no criminal defendant is automatically entitled to probation as a matter of law, *see State v. Davis*, 940 S.W.2d 558, 559 (Tenn. 1997). It is the defendant's burden to establish his or her suitability for full probation. *See State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008) citing T.C.A. § 40-35-303(b)). The defendant must demonstrate that probation will "subserve the ends of justice and the best interests of both the public and the defendant." *Hooper v. State*, 297 S.W.2d 78, 81 (Tenn. 1956), overruled on other grounds, *State v. Hooper*, 29 S.W.3d 1, 9-10 (Tenn. 2000). Among the factors applicable to probation consideration are the circumstances of the offense; the defendant's criminal record, social history, and present condition; the deterrent effect upon the defendant; and the best interests of the defendant and the public. *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978). Tennessee Code Annotated section 40-35-103(1) sets forth the following sentencing considerations, which are utilized in determining the appropriateness of alternative sentencing:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

*See also State v. Zeolia*, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996). Additionally, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). A defendant with a long history of criminal conduct and "evincing failure of past efforts at rehabilitation" is presumed unsuitable for alternative sentencing. T.C.A. § 40-35-102(5). Our supreme court has specifically held that the abuse of discretion standard, with a presumption of reasonableness, also applies to a review of a denial of alternative sentencing. *Caudle*, 388 S.W.3d at 278-79.

Here, the trial court stated if we "can't protect our children in society, we might as well hang it up," deeming confinement necessary to avoid depreciating the seriousness of the offense. The trial court did not abuse its discretion in denying an alternative sentence. Defendant is not entitled to relief.

### D. Consecutive Sentencing

In *State v. Pollard*, 432 S.W.3d 851 (Tenn. 2013), the Tennessee Supreme Court expanded its holding in *Bise* to also apply to decisions by trial courts regarding consecutive sentencing. *Id.* at 859. This Court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *Id.* at 861. "Any one of [the] grounds [listed in section 40-35-115(b)] is a sufficient basis for the imposition of consecutive sentences." *Id.* at 862 (citing *State v. Dickson*, 413 S.W.3d 735 (Tenn. 2013)). As relevant to this case, the trial court may order sentences to run consecutively if it finds by a preponderance of the evidence that "[t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damages to the victim . . . ." T.C.A. § 40-35-115(b)(5).

In considering consecutive sentencing, the trial court determined that Defendant qualified because he

> Committed two or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and the victim . . . , the time span of the defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim[.]

T.C.A. § 40-35-115(b)(5). In applying consecutive sentencing factor (5), the trial court noted that Defendant was at least twenty-one years older than the victim, whose mother did a "terrible job" by losing custody. The victim needed a father figure, tried to find one in Defendant, and ended up getting abused by Defendant. The trial court noted that the time span of the abuse was unknown. The trial court took issue with the fact that "much has been made about [the victim's] initiating or starting these acts" commenting that he

was "tired of men coming into this courtroom and saying I was seduced by a little girl." Defendant admitted to a wide scope of sexual acts, which the trial court found "completely inexcusable." The trial court found the victim suffered severe residual physical and mental damage which required inpatient treatment, medication management, and therapeutic intervention to treat her wide-variety of mental and physical issues either brought on or exacerbated by Defendant's actions. The trial court determined there was a "lot of truth" in the description of Defendant as a "monster." As a result, the trial court ordered the sentences to be served consecutively to each other for a total effective sentence of sixteen years at thirty percent. The record reflects that the trial court engaged in a careful consideration of the facts and the law. Defendant has failed to show that the trial court abused its discretion in applying the consecutive sentencing factor related to the commission of two or more offenses involving the sexual abuse of a minor, allowable in T.C.A. § 40-35-115(b)(5).

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE

- 13 -